Commonwealth *v.* Snyder, Appellant.

84

Submitted January 4, 1967. Before BELL, C. J., MUSMANNO, JONES, EAGEN, O'BRIEN and ROBERTS, JJ.

*George M. Snyder*, appellant, in propria persona.

*Richard A. Devlin* and *Henry T. Crocker*, Assistant District Attorneys, and *Richard S. Lowe*, District Attorney, for Commonwealth, appellee.

OPINION BY MR. JUSTICE ROBERTS, September 26, 1967:

George M. Snyder was convicted in 1961 of voluntary manslaughter and sentenced to a term of 6 to 12 years. After new trial motions asserting several evidentiary errors were denied, Snyder appealed to this Court which affirmed his conviction. *Commonwealth v. Snyder*, 408 Pa. 253, 182 A. 2d 495 (1962). On May 23, 1966 appellant filed a petition under the Post Conviction Hearing Act. The court below appointed coun-

sel, denied Snyder's request for a hearing and after argument dismissed the petition.

In this appeal from dismissal of the post conviction petition, Snyder alleges—in a pro se petition and brief notable for both their length and sophistication—that four coerced "confessions" were introduced at his trial, that the Commonwealth employed perjured testimony, that false statements by the trial judge in both his charge and opinion obstructed appellant's right to appeal, that the lower court's dismissal without a hearing of the post conviction petition was a denial of due process and an unconstitutional suspension of the writ of habeas corpus, and that appellant's sentence exceeds the statutory maximum. We shall treat each of these contentions seriatim.

### The Coerced Confession Claim

Snyder insists that four coerced "confessions" were admitted into evidence at his trial: (1) an oral statement, the notes of which were read at trial; (2) a written, signed statement (Commonwealth's Exhibit 35); (3) testimony as to a re-enactment of the crime performed by appellant and several police officers; and (4) appellant's own trial testimony. Since we have decided that these coerced confession allegations cannot be raised for the first time collaterally, we will not question appellant's classification of the latter two events as "confessions."

The record, combined with an affidavit filed by appellant's trial counsel, supports Snyder's assertion that the first two of the four confessions were obtained under circumstances violative of the rules announced in *Miranda v. Arizona,* 384 U.S. 436, 86 S. Ct. 1602 (1966) and *Escobedo v. Illinois,* 378 U.S. 478, 84 S. Ct. 1758 (1964). However, the United States Supreme Court decided in *Johnson v. New Jersey,* 384 U.S. 719, 86 S. Ct. 1772 (1966) that both the *Miranda*

and *Escobedo* decisions would be denied retroactive application—the *Miranda* rules would be applied only to persons whose trials had not begun as of June 13, 1966 and the *Escobedo* decision to trials commenced after June 22, 1964. See *Comonwealth v. Senk,* 423 Pa. 129, 223 A. 2d 97 (1966). Trial in the instant case commenced more than three years before June 22, 1964 so that appellant cannot avail himself of these two landmark decisions, at least to the extent that they hold that failure to give an accused opportunity to consult with counsel or absence of police attempts to advise the accused of his constitutional rights per se constitute a due process deprivation.

The nonretroactivity announced in *Johnson* was to an uncertain extent mitigated by the Supreme Court's pronouncement that police failure to comply with the doctrines of *Escobedo* and *Miranda* could form the basis of a claim that the accused's confession was involuntary: "Thus while Escobedo and Miranda provide important new safeguards against the use of unreliable statements at trial, the nonretroactivity of these decisions will not preclude persons whose trials have already been completed from invoking the same safeguards as part of an involuntariness claim." 384 U.S. at 730, 86 S. Ct. at 1779. See *Davis v. North Carolina,* 384 U.S. 737, 86 S. Ct. 1761 (1966). Based primarily upon this statement, appellant contends that he is entitled to a hearing on his involuntariness allegations under the doctrine of *Jackson v. Denno,* 378 U.S. 368, 84 S. Ct. 1774 (1964). We disagree and hold that appellant has waived[1] any coerced confession

---

[1] Waiver is here used not in the sense of whether the right itself was waived, a standard which is part of the constitutional right and thus a constitutional imperative for the states, but rather whether the opportunity to litigate an asserted denial of the right was waived by failure to do so in a prior proceeding. Compare *Gideon v. Wainwright,* 372 U.S. 335, 83 S. Ct. 792 (1963) with *Henry v. Mississippi,* 379 U.S. 443, 85 S. Ct. 564 (1965).

claim and has deliberately bypassed state procedures available to litigate this allegation.

Beginning with *Commonwealth ex rel. Fox v. Maroney*, 417 Pa. 308, 207 A. 2d 810 (1965), as amplified by *Commonwealth ex rel. Mullenaux v. Myers*, 421 Pa. 61, 217 A. 2d 730 (1966), this Court has consistently held that failure to raise at trial the issue of voluntariness precludes later, collateral attempts challenging the voluntariness of the accused's confession. We need not detail here, as we did in *Fox* and *Mullenaux*, the reasons supporting our insistence upon a contemporaneous objection to the admission of an allegedly involuntary confession other than to note our continuing judgment that a requirement of contemporaneous objection[2] is vital to the orderly administration of criminal trials and clearly serves a legitimate state interest. The record in the instant case is barren of any conduct by either counsel or appellant indicating that the voluntariness of the confessions was challenged.[3]

---

[2] To meet our contemporaneous objection requirement it is not necessary that the objection be made immediately before the attempted admission of the challenged confession. For example, .in *Jackson v. Denno*, supra, the trial court was informed that the voluntariness of the confession was in issue through attack upon the confession during cross-examination. As indicated in *Fox*, a request of any kind which serves to alert the trial judge to an issue of voluntariness is sufficient. Not only was there never any indication that the confessions were challenged in the instant case, but appellant's counsel urged that one of the confessions be read to the jury. See Trial N.T. 182.

[3] Counsel's failure to object is easily understandable for the alleged involuntary confessions, other than an admission that appellant had fired the fatal shot, were in great measure exculpatory—they contained repeated statements that the shooting was accidental, a claim which formed the basis of appellant's defense of homicide by misadventure. In fact, had the confessions not been admitted, the prosecution, aided by the presumption of malice arising from the use of a deadly weapon on a vital part of the body, might have been able to obtain a murder conviction. Trial

Implicit in our decision in *Fox,* as demonstrated by our reliance upon *Henry v. Mississippi,* 379 U.S. 443, 85 S. Ct. 564 (1965), was a realization that, although we might find that the accused's failure to object constituted a waiver of his federal claim,[4] in any collateral federal proceeding the federal court would examine whether the habeas applicant had deliberately bypassed state procedures. See *Fay v. Noia,* 372 U.S. 391, 439-40, 83 S. Ct. 822, 849 (1963). Henry was convicted partially on the basis of evidence allegedly seized in violation of the Fourth Amendment; his counsel failed to object when the evidence was admitted, though he did assert this alleged constitutional error as the basis for his directed verdict motion. Finding that the state had not yet had an opportunity to establish the presence of a waiver, the Supreme Court remanded the case to the state courts with full recognition that "petitioner might still pursue vindication of his federal claim in a federal habeas corpus proceeding in which the procedural default will not alone preclude, consideration of his claim, at least unless it is shown that petitioner deliberately bypassed the orderly procedure of the state courts." *Henry v. Mississippi,* su-

---

counsel most likely decided that appellant's repeated insistence immediately after the event that the shooting was accidental constituted substantial support for appellant's defense. Furthermore, appellant told Officer Bach, the first policeman to arrive at the scene, that he had fired the shot. See Trial N.T. 268. Even after *Miranda* this statement would have been admissible though no warnings had yet been given. See *Commonwealth v. Eperjesi,* 423 Pa. 455, 224 A. 2d 216 (1966). Faced with this statement, no real purpose would have been served by any attempt to exclude the exculpatory statements.

[4] The federal standard of waiver applicable to federal habeas corpus petitions by state prisoners is not a constitutional requirement for the states. See Comment, State Court Withdrawal from Habeas Corpus, 114 U. Pa. L. Rev. 1081, 1093 nn. 63-65 (1966). A state court is therefore free to adopt a more stringent definition of waiver than that employed by the federal courts.

pra at 452, 85 S. Ct. at 570. The clear import of *Henry* is that, where the state courts make no attempt to resolve the deliberate bypass issue, a federal court will do so. We accept the opportunity.[5]

The deliberate bypass concept has its origin in the following statement found in *Fay v. Noia,* supra at 439, 83 S. Ct. at 849: "If a habeas applicant, after consultation with competent counsel or otherwise, understandingly and knowingly forewent the privilege of seeking to vindicate his federal claims in the state courts, whether for strategic, tactical, or any other reasons that can fairly be described as the *deliberate by-passing* of state procedures, then it is open to the federal court on habeas to deny him all relief if the state courts refused to entertain his federal claims on the merits—though of course only after the federal court has satisfied itself, by holding a hearing or by some other means, of the facts bearing upon the applicant's default. [Citation omitted.] At all events we wish it clearly understood that the standard here put forth depends on the considered choice of the petitioner. [Citations omitted.] A choice made by counsel not participated in by the petitioner does not automatically bar relief. Nor does a state court's finding of waiver bar independent determination of the question by the federal courts on habeas, for waiver affecting federal rights is a federal question." (Emphasis supplied.) Noia had been convicted of murder on the basis of a coerced confession and sentenced to life imprisonment; no appeal was taken. After his co-conspirators' confessions were found constitutionally infirm, Noia filed a collateral, coram nobis proceeding in

---

[5] See also §4 of the recently enacted Post Conviction Hearing Act which requires that any waiver by the petitioner be knowingly and intelligently made, a formulation which is equivalent to a deliberate bypass by the petitioner. See discussion under *"Claim of Suspension of the Writ of Habeas Corpus,"* infra, p. 101.

a New York state court. The state petition was unsuccessful as was Noia's federal district court habeas petition—both state and federal district court found that Noia's failure to appeal waived his federal claim. The United States Supreme Court granted relief for it found no deliberate bypass of state procedure. Characterizing Noia's choice, whether to accept a life sentence or, if his appeal was successful, retrial and a possible death sentence, as "grisly,"[6] the Court found neither a tactical litigation choice nor a deliberate bypass.[7]

Snyder's choice—attacking his confession and thus possibly alienating the jury or permitting its admission without objection—was by no means grisly. The absence of any objection in the instant case is most easily explained in terms of counsel's tactical decision. See footnote 3, supra. Furthermore, although the practice followed for attacking the voluntariness of a confession in this Commonwealth at the time of appellant's trial was unconstitutional in light of *Jackson v. Denno,* supra,[8] Pennsylvania procedure did nevertheless afford a mechanism for attacking the confession. Upon request counsel could obtain a preliminary determination

---

[6] To buttress its conclusion, the Supreme Court stressed a statement by the trial judge that Noia had come perilously close to receiving the death sentence. Snyder, of course, would not face a similar problem for his conviction of voluntary manslaughter operated as an acquittal of the murder charge. Any later attempt to convict for murder would thus be barred. See, e.g., *Commonwealth ex rel. Light v. Cavell,* 422 Pa. 215, 220 A. 2d 883 (1966) ; *Commonwealth v. Frazier,* 420 Pa. 209, 216 A. 2d 337 (1966).

[7] The *Fay v. Noia* Court was careful to note that the mere presence of a threat of a possible death sentence on retrial is not sufficient to prevent a finding of deliberate bypass. For an example of such a case see *Commonwealth ex rel. Harbold v. Myers,* 417 Pa. 358, 207 A. 2d 805 (1965).

[8] See, e.g., *Commonwealth ex rel. Butler v. Rundle,* 416 Pa. 321, 206 A. 2d 283 (1965).

regarding the confession's admissibility, but if the court decided that the question of the voluntary nature of the confession was one of fact, this factual issue was resolved by the same jury that determined the question of guilt. See *Commonwealth v. Jones,* 341 Pa. 541, 19 A. 2d 389 (1941); *Commonwealth v. Spardute,* 278 Pa. 37, 122 Atl. 161 (1923); Laub, Pennsylvania Trial Guide §81.2 (1959).[9] Appellant or his counsel could therefore have interposed an objection to the admission of the now challenged confessions and, if the trial judge chose to leave the matter for the jury, have pursued the matter no further. Such a procedure would have served to alert the court and thus satisfied the contemporaneous objection requirement.

We need not rest, however, on a comparison between the situations confronting Snyder and Noia, for the Supreme Court in *Henry* has placed its own gloss on deliberate bypass. Thus *Henry* affords explicit sanction for the proposition that, absent exceptional circumstances, counsel's strategic decision will bind his client: "Although trial strategy adopted by counsel without prior consultation with an accused will not, where the circumstances are exceptional, preclude the

---

[9] Pennsylvania procedure prior to *Jackson* contrasts markedly with the Massachusetts rule held constitutionally sufficient in *Jackson v. Denno,* supra at 377-80 & nn. 8-9, 84 S. Ct. at 1781-82 & nn. 8-9. See *Commonwealth v. Sheppard,* 313 Mass. 590, 603-04, 48 N.E. 2d 630, 639 (1943) (Judge hears all the evidence and rules on voluntariness before allowing confession into evidence; if he finds the confession voluntary, jury is then instructed that it must also find that the confession was voluntary before it may consider it.) The Massachusetts procedure is now followed in Pennsylvania, see Pa. R. Crim. P. 323. In a few cases such as *Commonwealth v. Ross,* 403 Pa. 358, 365, 169 A. 2d 780, 783-84, cert. denied, 368 U.S. 904, 82 S. Ct. 182 (1961), the trial judge may have anticipated the requirements of *Jackson* and thus have made an independent determination of voluntariness, see *Jackson v. Denno,* supra at 398, 84 S. Ct. at 1792 (Appendix of Mr. Justice WHITE).

accused from asserting constitutional claims, see
*Whitus v. Balkcom*, 333 F. 2d 496 (C.A. 5th Cir. 1964),
we think that the deliberate bypassing by counsel of
the contemporaneous-objection rule as a part of trial
strategy would have that effect in this case." 379 U.S.
at 451-52, 85 S. Ct. at 569. To the extent that *Whitus*
is emblematic of exceptional circumstances, certainly
there were none present in the instant case. Counsel
in *Whitus* was faced with a choice of challenging the
systematic exclusion of Negroes from the juries of the
trial county, thereby further antagonizing a commu-
nity already incensed by the killing of a white farmer,
or foregoing attack on the jury's composition hopeful
that no further antagonism would be generated—a
choice, to use the terminology of *Fay v. Noia,* which
can readily be classified as "grisly." Counsel in the
instant case, as demonstrated above, faced no such
choice. We therefore conclude that counsel deliberate-
ly bypassed available state procedures for raising the
issue of voluntariness.

One further inquiry is necessary—may counsel's
deliberate bypass be imputed to appellant for purposes
of foreclosing subsequent assertion of his involuntari-
ness claim? We hold that, absent a showing of in-
competency or the presence of exceptional circum-
stances, counsel's decision not to attack the confession
binds his client. Our conclusion is premised not only
upon the particular circumstances of this case, i.e., a
confession which in great part was exculpatory and of
aid to the defense, but also upon the peculiar consid-
erations counsel must evaluate to decide whether an
attack on his client's confession should be launched.
The line between a voluntary and an involuntary con-
fession is one composed of subtle gradations, see *Com-
monwealth v. Garrett,* 425 Pa. 594, 599-601, 229 A. 2d
922, 925-27 (1967) ; compounding this difficulty is the

congeries of reasons why counsel might choose not to attack the confession—a desire to make defendant appear cooperative, a hope that police testimony can be shaken on cross-examination or, perhaps, a belief that the version of the crime offered in the confession can be used to defendant's advantage. A coupling of these two variables produces a complex decision which a layman is unequipped to make. Of necessity, the decision is one which must be made by counsel—a decision, once made, which binds the client.[10]

Our conclusion finds support in federal cases. Stressing that "counsel must be the manager of the law suit," the court in *Nelson v. California,* 346 F. 2d 73, 81 (9th Cir.), cert. denied, 382 U.S. 964, 86 S. Ct. 452 (1965) found that strategic reasons prompting counsel not to challenge either an arrest or search resulted in a deliberate bypass binding upon his client. See *Williams v. Beto,* 354 F. 2d 698 (5th Cir. 1965) (counsel's failure to move to quash indictment, to make an opening statement, to object to certain testimony and to request specific charges held binding on client); compare *Brookhart v. Janis,* 384 U.S. 1, 86 S. Ct. 1245 (1966) (counsel's entry of guilty plea contrary to client's expressed desire held not binding). Without attempting an exhaustive list of those trial decisions which are so fundamental that counsel's bypass will not foreclose later attack, we hold that counsel's decision not to object to admission of an allegedly coerced confession under the circumstances of the instant case defeats appellant's present collateral attack.

---

[10] Of course, as noted earlier, counsel's bypass would not foreclose his client if either counsel was found to be ineffective or the circumstances could be classified as exceptional. See, e.g., *Brubaker v. Dickson,* 310 F. 2d 30 (9th Cir. 1962), cert. denied, 372 U.S. 978, 83 S. Ct. 1110 (1963).

## Claims of Perjured Testimony and Obstruction of the Right to Appeal

Appellant claims that the chief detective of Montgomery County, Charles G. Moody, committed perjury with either actual or constructive knowledge on the part of the prosecution when Moody described the events surrounding appellant's interrogation and the contents of appellant's statements. This claim rests upon an alleged discrepancy between Moody's testimony at appellant's pretrial habeas corpus hearing and that given at trial.

It is well settled that "a *conviction* obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment. . . ." *Napue v. Illinois,* 360 U.S. 264, 269, 79 S. Ct. 1173, 1177 (1959). (Emphasis supplied.) Assuming arguendo that all the elements of perjury are present, see *Commonwealth v. Billingsley,* 357 Pa. 378, 54 A. 2d 705, affirming on the opinion of Superior Court, 160 Pa. Superior Ct. 140, 50 A. 2d 703 (1947), we fail to see in what manner Detective Moody's "perjury" could have contributed to appellant's conviction. The trial testimony was, by appellant's own admission, accurate and the pretrial testimony was not admitted at trial. Hence, any "perjury" committed by Chief Moody could not have contributed to appellant's conviction and thus cannot form the basis of a due process denial.

The *Napue* court further noted that even if the false testimony did not affect directly the issue of guilt, but rather only the credibility of a witness, its use would still constitute a denial of due process. Appellant insists that this rule should apply in reverse, i.e., if a witness has in the past given false testimony, then any conviction obtained on the basis of accurate testi-

mony by this witness is tainted.[11] We disagree. Appellant's contention overlooks the crucial distinction that *Napue* referred to false testimony given at trial which, when the true version was disclosed, could then be employed to destroy the witness' credibility. Chief Moody's trial testimony, according to appellant, accurately portrays the interrogation and statements; Moody's alleged perjury could thus in no manner have been a contributing factor to Snyder's conviction.

A second example of alleged perjury involves testimony of Dr. M. Harold Book, a pathologist who performed the post-homicide autopsy. Dr. Book estimated that the deceased weighed 145 pounds and was five feet, nine inches tall; the deceased's half-brother asserted at trial that the proper statistics were 170 pounds and five feet, eleven inches. To term Dr. Book's testimony perjurious, as does appellant, is to equate any conflict in matters over which disagreement is possible with the proposition that one of the witnesses of necessity has committed perjury—an equation we find clearly illogical. The importance of any discrepancy between Dr. Book's testimony and that of decedent's half-brother was for the jury. See *Commonwealth ex rel. LaRue v. Rundle,* 417 Pa. 383, 207 A. 2d 829 (1965).[12]

---

[11] At the time of trial Chief Moody had not been, nor has he ever been, convicted of perjury such that he would be disqualified from testifying. See Act of May 23, 1887, P. L. 158, §2(a), as amended, 19 P.S. §682. If defense counsel had so chosen, any alleged discrepancies in Chief Moody's testimony could have been used to attack his credibility and would have been admissible as prior inconsistent statements. See *Commonwealth v. Updegrove,* 413 Pa. 599, 198 A. 2d 534 (1964).

[12] Other allegations of perjury involve similar claims. For example, appellant insists that a conflict between testimony of Chief Moody and that of Jay Cochran, Jr., an F.B.I. ballistics expert, concerning the position of an expended shell in the chamber of appellant's gun rises to the level of perjury.

Appellant launches a massive attack on what he styles as a "campaign" by trial judge ROBERT W. HONEYMAN to deprive him of due process.[13] This attack centers upon allegedly false statements in both Judge HONEYMAN'S opinion denying motions for new trial and his summation of the evidence contained in the charge to the jury. The false statements in the new trial opinion, appellant asserts, misled this Court as to the facts of the case, resulted in an unjustifiable affirmance of appellant's conviction and thus obstructed his right to appeal.

The trial court opinion does contain two misstatements, the first of which involves the admission into evidence of a photograph employed to demonstrate the location of the entry wound. Defense counsel objected to admission, insisting that the pathologist's testimony alone as to the entry wound furnished an adequate description. Mr. Waters, the prosecuting attorney, suggested that the photograph could be admitted without fear of inflaming the jury if that portion of the photograph showing the decedent's head were deleted—a suggestion accepted by the court. However, the opinion states that the suggestion to decapitate the photograph came from the court rather than the prosecution. The second misstatement concerns the display before the jury of a vial of decedent's blood. Several times during trial the prosecution offered the vial into evidence and each time was rebuffed by the court below on the theory that the prosecution had yet to demonstrate its relevancy. Finally, at defense counsel's insistence, the vial of blood was removed from jury view. The record is unclear as to the length of time of the display, though it is arguable that the trial court opinion gives the impression that the time span of display was quite brief.

---

[13] Judge HONEYMAN also heard and denied appellant's post conviction petition.

We fail to see how these statements obstructed appellant's right to appeal. On appeal, defense counsel forcefully pressed his belief that admission of the photograph, albeit decapitated was error. Judge HONEYMAN'S statement that he suggested that the photographic head be removed was not in the remotest stretch of the imagination crucial to the admissibility of the photograph. It played no role in our decision and thus could not have obstructed appellant's appeal. An identical issue is posed by the display of the vial of blood. The defense insisted, as disclosed by Mr. Justice EAGEN'S opinion,[14] that mere display of the vial inflamed the jurors. In this posture, any distortion by the trial judge of the period of display could not have affected our disposition of appellant's appeal. Appellant's reliance upon *Commonwealth v. New*, 354 Pa. 188, 47 A. 2d 450 (1946) is clearly misplaced. New, during his murder trial, insisted that he was never in the presence of the deceased and that he did not attempt to flee to another jurisdiction. The trial judge's opinion denying new trial motions, however, placed New at the scene of the crime and stressed his purported flight. Classifying this statement as a disclosure of "fundamental error," this Court granted a new trial.[15] Judge HONEYMAN'S two statements, given their irrelevancy to the issues raised on appeal, are not a revelation of fundamental error.

The second prong of appellant's attack focuses upon the trial judge's summation of the evidence. Trial testimony discloses that Chief Moody and Jay Cochran, Jr., an F.B.I. ballistics expert, disagreed as to the manner in which appellant's gun was loaded and

---

[14] *Commonwealth v. Snyder*, 408 Pa. 253, 255-56, 182 A. 2d 495, 496 (1962).

[15] The thirty page opinion in *New* amply demonstrates a trial rife with error—the above distortion was only one among many prejudicial errors,

that Mr. Cochran stated that he received the gun from another federal agent. The summation indicated to the jury that Chief Moody and Agent Cochran were in agreement as to the condition of the gun and that Agent Cochran received the weapon from an Officer Bach.[16]

Where defense counsel does not object,[17] defendant cannot later complain of alleged misstatements in the trial judge's evidentiary summation without showing that these misstatements contributed prejudicially to the verdict. Compare *Commonwealth v. Becker,* 326 Pa. 105, 191 Atl. 351 (1937) with *Commonwealth v. Young,* 418 Pa. 359, 211 A. 2d 440 (1965) and *Commonwealth v. Chambers,* 367 Pa. 159, 79 A. 2d 201 (1951). In both *Young* and *Chambers* the trial judge's misstatements were held sufficiently prejudicial to warrant reversal and a new trial. A comparison of those two decisions with the instant case easily yields the conclusion that Snyder was not harmed by the trial judge's evidentiary summation.

Young was convicted of first degree murder after a jury charge which included the following admonition: "My comment, members of the jury, *and I have good reason for making it,* is that I think the defendant is guilty, and that it would be a miscarriage of justice to find him not guilty." (Emphasis sup-

---

[16] Whether Agent Cochran received the weapon from another F.B.I. agent or from Officer Bach is of little moment since defense counsel stipulated that transmittal and custody of the gun were proper, though he reserved an objection as to admissibility. Trial N.T. 32. We do not, however, rest our decision on this point.

[17] After the conclusion of his charge, the trial judge asked both counsel if they had any suggestions. Mr. Caiola, defense counsel, entered, "as a matter of formality," a general exception and several special exceptions which were not later pressed upon appeal. The court, in response, amplified its charge in several respects; defense counsel then stated: "With that, your Honor, I must state that your charge is adequate and fair. Thank you."

plied.) Whatever may be the impact of judicial commentary on the accused's guilt,[18] we held the jury could easily have believed on the basis of the italicized phrase that the judge was in possession of facts, not disclosed by the evidence, which were damaging to the accused. Chambers was also convicted of first degree murder. Chambers insisted at trial that he was merely the lookout for the two others—Phillips and Bryant—who had administered the fatal beating; Phillips, on the other hand, asserted that he took no part in the robbery-beating. The trial judge treated Phillips' version as true, thus usurping the function of the jury to resolve contested factual issues, and, as this Court found, contributed to the sentence of death rather than life imprisonment.

Judge HONEYMAN's mistake as to the individual who actually delivered the gun to Agent Cochran could have played no part in the jury's deliberations since, throughout the trial, it was never disputed that Snyder fired the weapon. Cochran testified as a ballistics expert and was employed by the Commonwealth primarily to describe the distance at which the gun was fired. Had there been in any way a factual dispute as to whether the gun examined by Cochran was actually Snyder's gun, then perhaps this statement could be said to have played a part in the jury's verdict.[19] Though there was some dispute as to the "load" of appellant's gun, we fail to see how the trial court's inadvertent minimization of this dispute oper-

---

[18] See *Commonwealth v. Lucier*, 424 Pa. 47, 225 A. 2d 890 (1967); *Commonwealth ex rel. Smith v. Rundle*, 423 Pa. 93, 99-100, 223 A. 2d 88, 91 (1966) (dissenting opinion).

[19] Judge HONEYMAN, at least three times in the body of his charge, stressed that the jury's recollection of the facts and not that of the trial judge must control. However, if the misstatements were prejudicial, this cautionary instruction would not cure the error. See *Commonwealth v. New*, supra at 213, 47 A. 2d at 464.

ated to appellant's prejudice given the fact that he never disputed having fired his weapon.[20]

## Claim of Suspension of the Writ of Habeas Corpus

Appellant directs a broadbased attack on the constitutionality of the recently enacted Post Conviction Hearing Act, Act of January 25, 1966, P. L. (1965) 1580, 19 P.S. §1180-1 et seq. (Supp. 1966), contending that the lower court's dismissal of his petition on the basis of §4 worked a suspension of the writ of habeas corpus. Section 4(b) of this act provides: "(b) For the purpose of this act, an issue is waived if: (1) The petitioner knowingly and understandingly failed to raise it and it could have been raised before the trial, at the trial, on appeal, in a habeas corpus proceeding or any other proceeding actually conducted, or in a prior proceeding actually initiated under this act; and (2) The petitioner is unable to prove the existence of extraordinary circumstances to justify his failure to raise the issue."

Such a dismissal is not a suspension of the writ for, prior to the adoption of the Post Conviction Hearing Act, we consistently held that trial counsel's failure to object waived any claim for coerced confession. See, e.g., *Commonwealth ex rel. Storch v. Maroney*, 416 Pa. 55, 204 A. 2d 263 (1964). In fact, §4(b) represents an expansion of the waiver concept for we must now examine whether counsel's decision can be imputed to his client such that the petitioner can be deemed to have "knowingly and understandingly failed to raise"[21]

---

[20] Appellant also complains of several alleged misstatements in the opinion below denying the post conviction petition. They neither support a claim that Judge HONEYMAN, to use appellant's phrase, "stacked the deck" nor have they misled this Court.

[21] The United States Supreme Court has quite clearly indicated that a knowing and understanding failure to raise a claim is

the issue. However, as earlier discussed, counsel's decision not to attack the validity of appellant's confessions should be equated in the instant case to a knowing and understanding failure by appellant to raise this issue at the appropriate time. We therefore hold that §4(b) precludes any claim for relief based upon the alleged coercive nature of appellant's confessions.[22]

Snyder's second allegation of a suspension of the writ is directed to the failure of the court below to hold a hearing pursuant to §9 of the act on his claims of the use of "perjured" testimony and an obstruction of the right to appeal. Section 9 requires a hearing only where the *facts* alleged would entitle petitioner to relief. Although the appellant's legal conclusions, i.e., perjury and obstructed appeal, form a sufficient basis for relief, there are no facts alleged which in legal contemplation support these conclusions. A hearing was therefore not necessary. Denial of a hearing did not work a suspension of the writ for §9 is certainly as charitable to petitioners as was Pennsylvania practice prior to the Post Conviction Hearing Act. See, e.g., *Commonwealth ex rel. Rogozinski v. Russell,* 422 Pa. 536, 222 A. 2d 734 (1966); *Commonwealth ex rel. Green v. Rundle,* 413 Pa. 401, 196 A. 2d 861 (1964).

---

equivalent to a deliberate bypass. See *Fay v. Noia,* supra at 439, 83 S. Ct. at 849. Thus, our earlier discussion of Snyder's deliberate bypass is here applicable.

[22] Neither appellant's brief nor his petition disclose any exceptional circumstances which would justify failure to raise the coercion issue. Furthermore, our own scrutiny of the record has failed to uncover any such circumstances.

Section 4(c) creates a rebuttable presumption that any failure by petitioner to raise an issue was knowing and understanding. Though appellant has given no reason for his failure sufficient to rebut this presumption, we do not rest our disposition on this ground.

## Claim of Illegal Sentence

Finally, appellant insists that an error in the computation of the effective date of his sentence has resulted in imposition of a sentence for voluntary manslaughter which exceeds the statutory maximum. With this contention we agree. The effective date of appellant's sentence is presently recorded as December 13, 1962. Snyder has been incarcerated for the following periods: (1) December 4 to December 13, 1960—10 days, comprising the time span between arrest and the granting of bail; (2) December 27, 1961 to February 2, 1962—38 days, the time between imposition of sentence and the grant of a supersedeas by this Court; and (3) January 18, 1963 to date.

Under the Act of May 28, 1937, P. L. 1036, §1, 19 P.S. §894, appellant was clearly entitled to credit for the time served after imposition of sentence and before the supersedeas was granted. Credit should also have been allowed for the ten day period prior to the grant of bail. The Act of August 14, 1963, P. L. 841, §1, 19 P.S. §898, provides: "Any person who *has been* convicted of an offense in any court in this Commonwealth and sentenced to a term of imprisonment shall be given credit toward the service of his sentence for any days spent in custody on this offense prior to the imposition of his sentence, *including any days spent in custody on this offense prior to the entry of bail.*" (Emphasis supplied.)

We hold that the words "has been" indicate a legislative intent that the statute apply to sentences imposed before as well as after the effective date of the act. Our conclusion is bolstered by the clear legislative indication in §1 of the Act of 1937, 19 P.S. §894, governing the computation of sentences, that a purely prospective application was intended. That section begins with the following phrase—"From and after the

passage of this act . . ."—demonstrating that the Legislature, when it intended prospective application, employed language to that effect.

Appellant was therefore entitled to credit for 48 days of time served. Subtracting 48 days from the date that appellant was last imprisoned—January 18, 1963—results in a conclusion that the proper effective date of appellant's sentence should be December 1, 1962, not December 13. Appellant's minimum sentence must therefore expire on December 1, 1968 and his maximum sentence on December 1, 1974; the record shall be changed to reflect this fact and is remanded to the Court of Oyer and Terminer and General Jail Delivery of Montgomery County for correction of the effective date of sentence.[23]

Order affirmed.

Mr. Justice COHEN took no part in the consideration or decision of this case.

---

[23] One further point deserves brief mention. Prior to our decision in *Commonwealth ex rel. Stevens v. Myers*, 419 Pa. 1, 213 A. 2d 613 (1965) it could have been argued that appellant's petition for correction of his sentence is premature since he has not yet served the minimum sentence imposed. For many of the reasons detailed in *Stevens* which prompted us to conclude that one may attack a sentence which he has not yet begun to serve, we now hold that an attack premised upon a claim that the petitioner's sentence exceeds the statutory maximum is proper even though the minimum sentence has yet to be completed.