Commonwealth *v.* Baity, Appellant.

Submitted November 13, 1967. Before BELL, C. J., MUSMANNO, JONES, EAGEN, O'BRIEN and ROBERTS, JJ.

*George Johnson and Melvin Dildine,* Assistant Defenders, and *Herman I. Pollock,* Defender, for appellant.

*Alan J. Davis,* Assistant District Attorney, *Richard A. Sprague,* First Assistant District Attorney, and *Arlen Specter,* District Attorney, for Commonwealth, appellee.

OPINION BY MR. JUSTICE ROBERTS, January 9, 1968:

In *Commonwealth v. Garrett,* 425 Pa. 594, 597-98, 229 A. 2d 922, 925 (1967) we announced the rule that a defendant who had pled guilty at trial could nevertheless challenge an allegedly coerced confession collaterally, provided he could prove that the plea was primarily motivated by the confession.[1] We are today faced with the task of settling some of the unresolved problems presented by this rule.

In 1949 appellant, William E. Baity, pled guilty to murder generally in connection with the robbery-mur-

---

[1] The privilege of collateral attack upon the confession, as set out in *Garrett,* is an exception to the general rule that "a plea of guilty, knowingly made, constitutes an admission of guilt and is a waiver of all nonjurisdictional defects and defenses." *Commonwealth v. Garrett,* supra at 597, 229 A. 2d at 924. See *Commonwealth ex rel. West v. Myers,* 423 Pa. 1, 222 A. 2d 918 (1966).

der of a Philadelphia bicycle shop owner. He was found guilty of murder in the first degree and sentenced to life imprisonment. No appeal was taken. Altogether, four young men were convicted of this crime and given life sentences, three having pled guilty, the fourth having been found guilty by a jury. In 1966 Baity commenced this action under the Post Conviction Hearing Act; it was his first attempt at collateral relief. Counsel was appointed, and on June 16, 1967 an evidentiary hearing was held in Philadelphia common pleas court before Judge SPAETH.

Appellant made but a single argument at that hearing. He testified that his confession was coerced from him by force, that his trial counsel made no attempt to inform him that such a confession was inadmissible, and that his subsequent guilty plea was therefore the product *solely* of this tainted evidence. The only other witness at the post-conviction hearing was the surviving member of Baity's two-lawyer-team appointed to defend him in 1949. He testified, in relevant part, that he had spoken to Baity several times before the plea was entered, and that Baity had admitted that the confession was obtained without the use of any force or threats. According to Baity's trial counsel, appellant had informed him that the confession was given after one of the interrogating officers told Baity that Harry Cohen, a co-defendant, had "fingered Baity" as the "trigger man", whereupon appellant claimed that he was only the lookout. Based on this information, counsel advised Baity that his confession was voluntary under the law, that a trial could well result in the death penalty, and that he had an informal understanding with the district attorney to recommend life sentences for those who pled guilty. According to trial counsel Baity's plea was voluntarily entered and came as the direct result of the discussions had between counsel and appellant.

At the conclusion of this hearing Judge SPAETH announced from the bench that he did not believe Baity's version of the 1949 interrogation, a version replete with physical beatings, threats, black jacks, etc. As a result, Baity's petition was denied. Realizing that the court's factual findings would not likely be overturned on appeal, appellant now maintains that the confession was involuntary solely because it had been obtained by "trick", i.e., the story related to Baity that he had been named as the "trigger" man.

Recognizing, as we did in *Garrett,* the numerous aspects of an impending trial that may influence a defendant to waive the entire ordeal by pleading guilty, we are nevertheless unable to find, in the present case, any factor other than the confession which in Baity's mind motivated the plea. In fact, Baity's trial counsel testified of record at the post-conviction proceeding that it was the confession which prompted appellant to enter the plea of guilty. The following dialogue appears between post-conviction counsel and Mr. Scaricamazza, appellant's original trial counsel: "Q. [By Mr. Johnson] Then did you discuss with him [Baity] the possibility of a guilty plea in this case? A. [Mr. Scaricamazza] Yes. Q. And could you detail the circumstances of that discussion? A. How he came to plead guilty? Q. Yes. A. He had already confessed to a crime. There was no doubt about it of his participation in the crime. He admitted he was the lookout." (Record at 9-10.) Mr. Scaricamazza's entire testimony contains no mention of any other piece of evidence, tainted or not, the knowledge of which might have prompted Baity to enter his plea.[2] If Baity's attorney

---

[2] There is some indication that Baity's trial counsel had an informal understanding with the district attorney that life sentences would be recommended for those who pled guilty. However, the record does not indicate any bargaining vis-a-vis this particular defendant or this particular crime. Thus we would be loath to hold,

had knowledge of any other facts supporting the wisdom of a guilty plea, it is clear that these were never made known to appellant.[3]  Furthermore, for purposes

---

as we did in *Garrett*, that a specific bargain was the primary motivating force for appellant's guilty plea. Nor do there appear to be present in this case any of the other nonevidentiary factors that frequently influence a defendant to plead guilty, i.e., a desire to "get the whole thing off his chest," the first step toward rehabilitation, the unwillingness to face the publicity of a jury trial, etc.

[3] We do not mean to imply that Baity's plea was not entered knowingly and intelligently simply because he was not told every possible relevant consideration which may have prompted his attorney to suggest the plea. We think it sufficient, for purposes of demonstrating that a plea was knowingly and intelligently entered, that Baity was told by counsel that the confession was admissible, and would probably be sufficient, in and of itself, to convict him. Based on this knowledge, Baity's agreement to plead guilty was made with sufficient personal participation on his part to satisfy due process requirements. Although, here again, the court would have been better advised had it conducted an on-the-record-inquiry before accepting the plea, we realize that such a practice was not generally followed in 1949. *Commonwealth ex rel. West v. Rundle*, 428 Pa. 102, 237 A. 2d 196 (1968). See also, *People v. Serrano*, 15 N.Y. 2d 304, 258 N.Y.S. 2d 386, 206 N.E. 2d 330 (1965) ; Comment, 54 Calif. L. Rev. 1262, 1268 (1966).

Admittedly, Baity's trial counsel did not tell appellant that the confession *could* be challenged. On this ground it is argued that the entry of the plea could not have been knowingly and intelligently made. This Court faced an identical argument in *Garrett*, and rejected it, saying: "To suggest . . . that a defendant must always be told of the theoretical possibility that a confession could be excluded is of no avail if the defendant lacks the ability and knowledge to be able to make a rational tactical choice based upon that information. . . . Accordingly, we conclude that counsel may make the initial determination as to whether the confession would, if challenged, be nonetheless admitted. Then upon the strength of this conclusion he and his client must determine their strategy concerning a possible plea." *Commonwealth v. Garrett*, 425 Pa. at 600-01, 229 A. 2d at 926. But cf. *United States ex rel. Cuevas v. Rundle*, 258 F. Supp. 647 (E.D. Pa. 1966). In the present case it is uncontradicted that trial counsel informed appellant of his conclusion that the confession was admissible.

of the *Garrett* test, speaking as it does in terms of what *motivated* appellant to plead guilty, we must not examine the mind of anyone save Baity himself.

Once satisfied that the allegedly bad confession *was* the primary motivation for appellant's plea, we must now decide whether, in fact, the confession was constitutionally infirm. To make this decision, however, we must resolve one of the unsettled questions implicitly raised by the *Garrett* test: are we to be governed by 1949 law or 1967 law in passing upon the voluntariness of Baity's confession? We start, of course, with the proposition, now firmly established both by this Court, and the Supreme Court of the United States, that an *involuntary* confession, unlike a confession procured in the absence of *Miranda* or *Escobedo* warnings, could have such an impact on the reliability of the fact finding process, due to the substantial possibility that it represents an untruth, that we give retroactive application to all the current United States Supreme Court cases dealing with involuntary confessions. See, e.g., *Davis v. North Carolina,* 384 U.S. 737, 86 S. Ct. 1761 (1966); cf. *Commonwealth v. Padgett,* 428 Pa. 229, 238, 237 A. 2d 209, 214 (1968). See also, Mishkin, "Foreword: The High Court, The Great Writ, and the Due Process of Time and Law", 79 Harv. L. Rev. 56, 79-86 (1965). Thus, were we faced with an involuntariness claim stemming from a 1949 jury trial in which the confession were used as evidence, there would be no doubt that 1967 law would dictate the parameters within which the confession must now be tested. So then, the question becomes simply: ought there be a difference between a confession used to convict at trial, and one used to motivate the entry of a guilty plea, i.e., a difference sufficient to alter the test of voluntariness used in a collateral proceeding such as this. We think not.

Assuming that Baity's guilty plea was entered because he felt that the confession would be used at trial, it seems clear that this plea would be no more reliable than a jury verdict based on the same allegedly coerced confession. Moreover, the reason stated by Professor Mishkin for the retroactive application of involuntary confession cases is equally applicable to both guilty pleas *and* jury trials.

"Valuing the liberty of the innocent as highly as we do, earlier proceedings whose reliability does not measure up to current constitutional standards for determining guilt may well be considered inadequate justification for continued detention. For to continue to imprison a person without having first established to the presently required degree of confidence that he is not in fact innocent is indeed to hold him, in the words of the habeas corpus statute, 'in custody in violation of the Constitution.' On this basis, habeas corpus would assess the validity of a conviction, no matter how long past, by any current constitutional standards which have an intended effect of enhancing the reliability of the guilt-determining process." 79 Harv. L. Rev. at 81-82.[4] We therefore hold that Baity's confession must be tested by the most recent cases.[5]

---

[4] It is clear that Professor Mishkin does not intend the above quoted rationale to apply to *Miranda* or *Escobedo* violations, since, as we have already stated, such violations do not often go to the actual reliability of the confession, and, as stated in footnote 84 (79 Harv. L. Rev. at 81), the word "guilt" is used throughout the article to refer only to actual guilt *in fact*, i.e., has the accused committed the crimes charged?

[5] A similar *conclusion* has been reached in other jurisdictions, although the courts there involved never actually *decided* the issue. See *Smiley v. Wilson*, 378 F. 2d 144 (9th Cir. 1967) ; *Bell v. Alabama*, 367 F. 2d 243 (5th Cir.), cert. denied, 386 U.S. 916, 87 S. Ct. 859 (1966) ; *Gladden v. Holland*, 366 F. 2d 580 (9th Cir. 1966) ; *Dorsciak v. Gladden*, 425 P. 2d 177 (Ore. 1967).

On the basis of Mr. Scaricamazza's testimony below—testimony accepted as true by the hearing judge—it appears that Baity was arrested on the evening of March 21, 1949. He was then taken to a police station and jailed overnight. By Baity's own admission, no interrogation took place until the following morning. At nine a.m., March 22nd, the interrogation commenced. There is no indication that this interrogation was accompanied by any physical force or threats, nor does it appear that rest periods or food were denied appellant. The confession was given, reduced to writing, and signed by 5:15 p.m. that same day. Mr. Scaricamazza did testify to the following stratagem used by one of the detectives, a device which apparently prompted Baity's first admission of guilt. Baity was told that Harry Cohen, a co-defendant, had named appellant as the "trigger man". Baity immediately denied this, claiming that he had been merely the lookout.[6] Finally, it is conceded that appellant was never warned of his right to counsel or of his right to remain silent.

We believe that the facts recited above cannot support a claim of involuntariness, even tested by the most recent Supreme Court decisions, and on this ground alone relief could be properly denied. In *Culombe v. Connecticut*, 367 U.S. 568, 81 S. Ct. 1860 (1961), the Supreme Court of the United States set out a test for determining the voluntariness of a confession which remains controlling today. Mr. Justice FRANKFURTER, writing for the Court, explained the test as follows: "Is the confession the product of an essentially free and unconstrained choice by its maker? If it is, if he has willed to confess, it may be used against him. If it is not, if his will has been overborne and his capacity

---

[6] It never appears, at least on the face of the post-conviction record, whether Cohen actually made such a statement. However, the truth or falsity of this accusation is not here relevant. See note 7, infra.

for self-determination critically impaired, the use of his confession offends due process." 367 U.S. at 602, 81 S. Ct. at 1879. Although the Supreme Court of the United States has said that each involuntary confession case must be treated on its own facts, nevertheless a comparison between the facts in the present case, and those surrounding confessions recently held involuntary, convinces us that, in the words of *Culombe,* Baity's confession was not the product of an overborne will. In *Davis v. North Carolina,* 384 U.S. 737, 86 S. Ct. 1761 (1966) a confession was invalidated which was not given until the defendant had been interrogated for *sixteen* straight days, with little or no breaks for rest. In the present case, the interrogation did not even span that many *hours. Haynes v. Washington,* 373 U.S. 503, 83 S. Ct. 1336 (1963) saw the Court invalidate a confession that was given only after the defendant had been told that he could not see his wife until he talked. Nowhere does it appear that Baity was denied the right to have visitors. Finally, in *Culombe* itself, the police took a suspect with the mental age of a nine year old, interrogated him for five straight days, twice paraded him through the crowd-lined streets of New Britain, Connecticut, exhibited him in a wire mesh cage where he was photographed by newspaper photographers, and denied his request for counsel.

Except for the absence of *Miranda* and *Escobedo* warnings, an infirmity which, by itself, could not support an involuntariness claim, see *Johnson v. New Jersey,* 384 U.S. 719, 86 S. Ct. 1772 (1966), the only other possible irregularity present in Baity's interrogation was the so-called "trick." The Supreme Court of the United States has spoken infrequently in the area of trick confessions, but those few cases which do appear indicate that the law in this area does not conflict with our own Pennsylvania decisions. As early as 1923, this Court announced the rule that a trick which has

no tendency to produce a false confession is a permissible weapon in the interrogator's arsenal. *Commonwealth v. Spardute,* 278 Pa. 37, 47, 122 Atl. 161, 164 (1923). There is no indication from later cases that this rule has been changed.[7]

Two decisions of the Supreme Court of the United States clearly illustrate the type of trick which can rise to a deprivation of due process. In both cases, the likelihood that the trick produced a false confession is evident. By comparison, it would be almost a misnomer to call the device employed against Baity a trick at all. In *Spano v. New York,* 360 U.S. 315, 79 S. Ct. 1202 (1959), the defendant, after shooting to death an ex-prizefighter who had beaten him earlier in the evening, telephoned his close friend, one Gaspar Bruno, a rookie policeman, and told Bruno that he had killed decedent because he was still in a daze from the beating. Placing duty before friendship, Bruno immediately relayed this information to his superiors who arrested defendant. When defendant blithely refused to answer any questions without his lawyer, the detectives contacted Bruno and suggested that he tell defendant that his (defendant's) refusal to confess was making Bruno's story look untrue and that as a result Bruno would be in serious trouble if defendant did not talk.

---

[7] See *Commonwealth v. Graham,* 408 Pa. 155, 182 A. 2d 727 (1962) ; *Commonwealth v. Johnson,* 372 Pa. 266, 93 A. 2d 691 (1953) ; *Commonwealth v. Hipple,* 333 Pa. 33, 3 A. 2d 353 (1939). Although the Commonwealth in its brief suggests that a distinction has been drawn between those cases involving a trick based upon an underlying statement that was itself true, and one employing a statement that was never in fact made, we find no support for such a distinction in the cases. Nor do we think it would be a meaningful distinction if made. The test here, as is the test for any involuntary confession, must concern itself with those elements impinging upon a defendant's will. Thus, it would matter not, in the present case for example, whether Cohen *actually* made the statement attributed to him, since Baity would have no way of ascertaining its accuracy.

Bruno agreed, although in fact his job was in no way threatened. Then, after he had thrice met with Spano, and pleaded with him to confess, the defendant, to save both his friendship with Bruno and the latter's job, admitted the killing. This confession was quite naturally held involuntary.

*Leyra v. Denno,* 347 U.S. 556, 74 S. Ct. 716 (1954) presents an even more extreme case. After several days of intensive questioning concerning the hammer slaying of his parents, Leyra complained of sinus trouble and requested a doctor. He was told to lie down in a room which had been previously "bugged" and was at that time being monitored by the police captain. In a few minutes a man appeared who identified himself as a doctor. Although he was indeed a doctor, he neglected to tell Leyra that he was also a psychiatrist skilled in the art of hypnosis. The doctor then proceeded to hypnotize defendant, who confessed to the atrocious crime, in response to questions such as "Yes. You picked up the hammer. Where was the hammer?" As soon as this "confession" was complete, the police captain rushed into the room and had defendant repeat the story. Both confessions were held inadmissible.

By contrast, the stratagem employed by the police in the present case could not fairly be said to have a likelihood of producing a false confession. Although Baity probably believed that being a lookout would subject him to a lesser penalty than being the trigger man, and thus confessed to his part in the crime as an exculpatory gesture, nevertheless he surely realized that even as a lookout his conduct was illegal. In order to deny that he pulled the trigger, there was certainly no need to confess to some other criminal conduct. In view of the fact that Baity's interrogation spanned less than nine hours, was unaccompanied by physical violence, and did not employ any trick designed to pro-

duce a false story, we hold that appellant's resulting confession was voluntary.

Because our *Garrett* opinion did not explore the relationship between the test there set out for determining if a confession preceding a guilty plea could be collaterally attacked and the waiver provisions of the Post Conviction Hearing Act, and furthermore, because we feel that this relationship must be clarified, we hold alternatively that even if Baity's confession was involuntary, §4 of the Post Conviction Hearing Act[8] as interpreted by *Commonwealth v. Snyder,* 427 Pa. 83, 90 n.5, 233 A. 2d 530, 534 n.5 (1967), would bar relief. In other words, although under *Garrett,* Baity's guilty plea does not *itself* preclude collateral attack on the confession, nevertheless since there is evidence that a tactical decision was made not to challenge the confession by the available state procedure of going to trial and objecting to its admission, and since that tactical decision would have remained the same even if the confession *could* have been excluded by timely objection, there exists a procedural waiver under §4 of the right to now challenge Baity's statement.

We start with the proposition that whether the failure to challenge the confession manifested itself, as here, through the entry of a guilty plea, or, as in *Snyder,* through the failure to object to the confession's use at trial, or, as in *Fay v. Noia,* supra, through the failure to take an appeal from the trial judge's admis-

---

[8] Act of January 25, 1966, P. L. (1965) 1580, §4(b)(1), 19 P.S. §1180-4(b)(1) (Supp. 1966) : "For the purposes of this act, an issue is waived if: (1) The petitioner knowingly and understandingly failed to raise it and it could have been raised before the trial, at the trial, on appeal, in a habeas corpus proceeding or any other proceeding actually conducted . . . ." We held in *Snyder* that the requirement that petitioner "knowingly and understandably" fail to raise an issue was equivalent to the requirement set out in *Fay v. Noia,* 372 U.S. 391, 439, 83 S. Ct. 822, 849 (1963), that the failure to litigate must constitute a "deliberate bypass" of state procedure.

sion of the statement, for purposes of §4 and the waiver of the right to challenge that confession in a Post Conviction Hearing Act proceeding, the test remains the same: was there a tactical reason for the failure to pursue an available state procedure whereby the confession *could* have been challenged, and if such a tactical choice was made by counsel, can it be imputed to the defendant?[9] Assuming, arguendo, that Baity's confession would be considered involuntary by today's standards, there is no doubt that in 1949 his statement was admissible.[10] Thus, to the extent that a trial would have resulted in the admission of Baity's confession— a confession which, by itself, would have been sufficient to convict—counsel indeed made a "tactical" decision to plead guilty rather than risk an obviously ill-fated challenge to the confession at trial. However, given the retroactivity of coerced confession cases, and the assumption (for purposes of this discussion only) that

---

[9] There does exist one limitation on this doctrine, a limitation set out in *Fay v. Noia*, supra. Although a tactical decision was made in *Fay* not to challenge an allegedly coerced confession by appealing Noia's conviction, the Supreme Court of the United States held that this choice would not preclude later collateral attack because the choice was so "grisly" as not to amount to a *deliberate* bypass. In *Fay*, the defendant who had received a life sentence at his first trial, risked a possible death sentence on re-trial if his appeal were successful. This risk was made "grisly" when the trial judge informed Noia that he had come dangerously close to a death sentence. Following the lead of the court in *Fay*, however, we stressed in *Commonwealth ex rel. Harbold v. Myers*, 417 Pa. 358, 207 A. 2d 805 (1965), and again in *Snyder*, 427 Pa. at 91 n.7, 233 A. 2d at 535 n.7, that a tactical decision would not be termed "grisly" simply if it was made with an eye toward avoiding a possible death sentence. There must be more, such as the trial judge's remark in *Fay*, in order to escape a deliberate bypass. Thus, although in the present case, Baity's decision to plead guilty was of course influenced by a desire to avoid the electric chair, this alone would be insufficient to escape a §4 waiver.

[10] The 1949 admissibility was conceded at the post-conviction hearing by Baity's attorney. See record at 21.

these cases, had they existed in 1949, would have been sufficient to exclude Baity's statement, it would be manifestly unfair to hold appellant to a §4 waiver when neither he nor his attorney had any way of knowing that there existed a claim to waive. See *O'Connor v. Ohio,* 385 U.S. 92, 87 S. Ct. 252 (1966).

Yet, our inquiry into §4 does not stop here. We must yet determine whether appellant would have foregone an attack upon the confession and entered a plea of guilty even if it had been known that the confession could have been excluded. A careful examination of the 1949 proceedings does indeed reveal the presence of additional untainted evidence which would have been sufficient to convict Baity even if his confession were not used at trial. Furthermore, there is no reason to suppose that Baity's lawyer was not fully aware of this other evidence when he suggested to appellant that a plea be entered. Of course, Baity himself knew only of the confession, and in his mind, as previously demonstrated, the confession alone motivated the plea. But once we conclude that appellant was told enough by his attorney to satisfy the requirement that a guilty plea be entered with at least some personal participation on the part of the accused (a conclusion that we have in fact reached, see footnote 3, supra), then it does not become necessary to show that the attorney communicated to his client *all* the underlying legal reasons (including his evaluation of the additional evidence) for advising the plea of guilty. Assuming that such underlying reasons were present in the attorney's decision, for §4 purposes appellant stands bound by them, just as he would stand bound by counsel's reasonable tactical decisions made during the course of trial. See *Commonwealth v. Snyder,* 427 Pa. at 93-94, 233 A. 2d at 536; cf. *Commonwealth ex rel. Washington v. Maroney,* 427 Pa. 599, 235 A. 2d 349 (1967).

All that remains, therefore, to show a §4 waiver in the present case is a recitation of that additional evidence upon which Baity probably would have been convicted. We stated earlier in this opinion that one of the four co-defendants, Harry Cohen, elected to plead not guilty and face a jury trial. At that trial two gas station attendants testified that they saw three young Negro boys run from decedent's store immediately following the gunshots. The boys ran west on Fitzwater Street.[11] These witnesses were unable however to identify the boys. However, when Cohen himself testified, he stated that he began walking east on Fitzwater Street in the company of Baity and the other two boys here involved, that he (Cohen) stopped walking before the group reached Broad Street, and that he subsequently saw his three friends turn the corner at Broad and Fitzwater (the store's entrance was on Broad Street), and then, minutes later, come running past him west on Fitzwater, yelling, "Split, split!"[12] The time of Cohen's observation coincides with the time at which the gas station attendants saw three unidentified boys dash from the store. Since Cohen was convicted before Baity's degree of guilt hearing, there is nothing to indicate that he would have refused to testify had Baity chosen to face trial rather than enter a plea. Cohen's testimony, coupled with that of the attendants, certainly would have been sufficient to place appellant at the scene of the crime.

Furthermore, Herbert Elliott, the confessed trigger man, testified at the degree of guilt hearing, at which time he explained the entire crime, and named the par-

---

[11] Decedent's store was located on the northwest corner of Broad and Fitzwater Streets, Philadelphia.

[12] Cohen's defense was that he did not know that the other three boys were planning to rob the store, or that one of them had a gun. These two assertions were seriously shaken on cross-examination, however.

ticipants, including Baity. Appellant's trial counsel had no reason to suspect that Elliott, who had so testified against himself, would not be equally willing to testify against Baity.[13] We therefore conclude that even if Baity's confession could be held involuntary, he nevertheless waived the right to litigate that confession now under §4 of the Post Conviction Hearing Act.

Order affirmed.

Mr. Justice JONES and Mr. Justice EAGEN concur in the result.

Mr. Justice COHEN took no part in the consideration or decision of this case.

---

CONCURRING AND DISSENTING OPINION BY MR. CHIEF JUSTICE BELL:

I concur in the result but disagree with numerous statements and much of the reasoning in the majority Opinion.

---

[13] Elliott's failure to testify at Cohen's trial can be easily explained. Cohen was tried several days before Elliott's degree of guilt hearing and subsequent conviction. However, the Commonwealth could certainly have chosen to try Baity *after* Elliott had been convicted, in order that Elliott would have no reason to object to testifying against appellant.